**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Earl Hall, | : | Case No. 3:10 CV 00808 |
| Petitioner, | : | |
| vs. | : | |
| Jessie Williams, Warden, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Respondent. | : | |

Pursuant to 72.2(b)(2) of the United State District Court Northern District of Ohio Local Civil Rules, this case was automatically referred to the undersigned Magistrate Judge for report and recommendation.  Pending are (1) Petitioner's Petition under 28 U. S. C. § 2254 for Writ of Habeas Corpus, Respondent's Return and Petitioner's Traverse and  (2) Petitioner's Motion to Stay, Respondent's Response and Petitioner's Supplement (Docket Nos. 1, 10, 13, 14, 15 & 18).  For the reasons that follow, the Magistrate recommends that the Court deny the Motion to Stay and  the Petition for Writ of Habeas Corpus.

### I.  FACTUAL BACKGROUND.

The factual findings made by a state court in the direct appeal are presumed to be correct in a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to a judgment in state court.  28 U. S. C. § 2254 (e) (1) (Thomson Reuters 2011).  A habeas court must presume the state court's factual findings are correct.  28 U.S.C. § 2254(e)(1) (Thomson Reuters 2011).  The petitioner shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence.  28 U. S. C. § 2254(e)(1)(Thomson Reuters 2011).

In this case, Petitioner has not sustained the burden of rebutting the presumption of correctness of the facts that follow:

Ten witnesses testified at trial for the state.  Jason Garlock, a police officer with the Lima Police Department ("Lima PD") since May 1999, testified that he was assigned as a drug investigator with the pro-active crime enforcement ("P.A.C.E.") unit during the summer of 2006 (Sept. 16-18, 2008 Tr. Vol. I at 40). Garlock testified that the P.A.C.E. targets enforcement of drug laws by utilizing confidential informants ("C.I.") and executing search warrants. ( *Id.*).  During the summer of 2006, Garlock was working in the two hundred block of South Pine Street (S. Pine St.) in Lima, Allen County, Ohio after a C.I. informed the police that he was able to purchase crack cocaine from a house at 261 S. Pine St. ( *Id.* at 41).  The C.I. informed law enforcement that he had purchased drugs from this location ten times in the last two weeks ( *Id.* at 42).  The C.I. also informed police that a black female was selling drugs within the residence, but if she did not have any drugs to sell, someone at 261 S. Pine St. would call, gesture, whistle, or yell to someone across the street at 260 S. Pine St., and a black male from 260 S. Pine St. would bring the drugs over to 261 S. Pine St. ( *Id.* at 42-43). Garlock testified that he observed this scenario during a controlled buy conducted by the C.I. ( *Id.*). According to Garlock, based upon that information police obtained a search warrant for 260 S. Pine St., which was executed by the Lima PD S.W.A.T. and P.A.C.E. units ( *Id.* at 44).

Garlock testified that the warrant was executed around 1:42 p.m., and that he was a perimeter officer stationed on the northwest side of the residence ( *Id.* at 44-45).  Garlock testified that his responsibility in executing the warrant was to collect and inventory seized evidence ( *Id.* at 45). Garlock identified several photographs admitted as exhibits for the state, including: state's exhibit 12 as a diagram of the inside of the residence at 260 S. Pine St.; state's exhibit 13 as the residence at 260 S. Pine St.; state's exhibit 15 as the residence's back bedroom where Hall and Adrienne Thompson were located; state's exhibit 16 as a digital scale found in the back bedroom; state's exhibit 17 as the window air conditioner in the back bedroom; state's exhibit 18 as the two bags of crack cocaine that were placed on the windowsill; state's exhibit 19 as a shoe found in the back bedroom containing a baggie of crack; state's exhibit 20 as a close up of the inside of the shoe containing a baggie of crack; and state's exhibit 22 as a .40 caliber Ruger pistol found in an upper cabinet in the computer room located off of the living room ( *Id.* at 46-50); (state's Ex. 12, 13, 15-20, 22). Garlock also identified state's exhibit 1 as the firearm that was found loaded with four live rounds of ammunition and the safety off and state's exhibit 2 as a buccal swab obtained from William Burge (Sept. 16-18, 2008 Tr. Vol. I at 50-51).  Garlock testified that he obtained the buccal swab from Burge himself, and that the swab was used to collect DNA evidence ( *Id.* at 52).  Garlock testified that state's exhibit 3 was a buccal swab he collected from Adrienne Thompson and state's exhibit 4 was a buccal swab Officer Ken Whitney collected from Hall in his presence ( *Id.* at 52, 54).  Garlock further identified state's exhibit 5 as the scale found on a table in the back bedroom; state's exhibit 6 as numerous cell phones located in the residence; state's exhibit 7 as the crack cocaine located on the windowsill; state's exhibit

2

8 as the baggie of crack found in the shoe; and state's exhibit 9 as a plastic bag that was taken from Hall's right rear pants pocket ( *Id.* at 55-58).

Garlock further testified that some of the delay associated with the DNA testing was because BCI & I requested that standards from all persons found at 260 S. Pine St. be submitted for comparison to the DNA found on the plastic baggies containing crack cocaine ( *Id.* at 58). Garlock admitted that this delay was a result of a miscommunication on his and his team's part, due to the fact that Investigator Delong informed his team that he saw a black male's hand place the baggies on the windowsill in the room where Hall was found ( *Id.* at 59). Garlock testified that based upon this information, and the fact that Hall was the only black male found in the room, he swabbed Hall so that his DNA could be compared to that found on the baggies of crack ( *Id.* at 59-60).

On cross-examination, Garlock testified that William Burge was walking back and forth between 260 and 261 S. Pine St., and that Burge was found at the location searched. ( *Id.* at 60). Garlock testified that Investigator Delong took the photographs earlier identified ( *Id.* at 61). Garlock admitted that the firearm found at the residence was not found in the room with Hall and that no fingerprinting or DNA tests were conducted on the firearm ( *Id.* at 61-62). Garlock testified that law enforcement was acting on a tip that Burge was trafficking drugs for a main supplier and admitted that a crack pipe was found underneath Burge ( *Id.* at 63-64). Garlock further testified all three occupants were originally charged with keeping a disorderly house ( *Id.* at 64). Garlock testified that the crack cocaine found in the shoe was not immediately visible and that the shoe was not found on the bed as photographed in state's exhibit 20 ( *Id.* at 65-67). Garlock also testified that the firearm was located in a high cabinet, so the photograph appears to be taken on an angle ( *Id.* at 68); (state's Ex. 22). Garlock explained that there was no picture of the baggies of crack while they were on the windowsill and that moving evidence before photographing it was not a general police practice ( *Id.* at 70-71). Garlock testified that the warrant executed on 260 S. Pine St. was a "knock first" warrant, and so it was possible that people moved around in the house prior to law enforcement entering the house ( *Id.* at 72). Garlock further testified that he was immediately informed that a hand came out of the bedroom, but "it was substantially after that it was determined that it was a black male's hand from Investigator Delong" ( *Id.* at 73). Garlock admitted that they could have taken photographs of the baggies of crack on the windowsill, but thought that the windowsill was too high and perhaps that was why the drugs were secured from inside the house ( *Id.*).

Garlock further testified that $7,000 was found in a vehicle parked in front of the residence, but that a court, in a separate action, determined that the money belonged to Lille and Pequina Burge, not Hall ( *Id.* at 74-75). Garlock testified that none of the cell phones were tested for fingerprints and that none of the four cars found at the residence were registered to Hall ( *Id.* at 75-76). Garlock admitted that the photograph of the window air conditioner was not as it appeared when police entered the room; rather, the accordion-style vent was closed ( *Id.* at 77). Garlock further testified that no DNA swabs were taken from Lillie or Paquina Burge, Willie Helton, or any of Hall's, Burge's, or Thompson's relatives ( *Id.* at 78). Garlock admitted that no fingerprinting or DNA testing was performed on the crack pipe, and that he was unsure whether all the officers used latex gloves when collecting evidence, though they generally do wear gloves ( *Id.* at 79-80).

3

On re-direct examination, Garlock testified that even though none of the vehicles found were registered to Hall or his girlfriend, Thompson and he were the ones primarily driving the vehicles ( *Id.* at 81-82). Garlock also testified that the majority of the photographs showed the evidence as it appeared at the scene with the exception that the crack was removed from the windowsill before photographed. ( *Id.* at 83). Garlock further testified that the search warrant was not for the sole purpose of arresting Burge but to collect evidence of drug trafficking ( *Id.*).

Officer Kenneth Whitney, a Lima police officer for 31 years and an identification officer for 18 years, testified that his responsibilities as an identification officer were to collect prints at the crime scene, taking fingerprints from prisoners, photography, test-firing of weapons, and testing of marijuana ( *Id.* at 87). Whitney identified state's exhibit 4 as the buccal swab he collected from Hall on July 26, 2006, and identified Hall as the defendant in open court ( *Id.* at 88-89). Whitney testified that he placed the swab into a box, initialed the box, placed the box into a manila envelope, sealed it with tape, and placed the envelope into the Lima PD property room, where the evidence remained until it was transported to the lab for testing ( *Id.* at 89-90).

Lindsey Hail testified that she was employed at the BCI & I lab in Bowling Green, Ohio, as a forensic scientist in the forensic biology and DNA unit from January 2004 to September 2007, and that she has examined thousands of evidence samples ( *Id.* at 92-93). Hail testified that she left BCI & I due to personal reasons, not due to any disciplinary action ( *Id.* at 93). The trial court qualified Hail as an expert in forensic DNA analysis ( *Id.* at 97). Hail testified that two DNA swab samples were created for each of the two baggies of crack cocaine (four swab samples in total) ( *Id.* at 100). Hail testified that she analyzed DNA samples from Burge, Thompson, and Hall and compared these to the swab samples collected from the two baggies ( *Id.* at 101-102). Hail identified the DNA samples taken from these three individuals as state's exhibits 2, 3, and 4, respectively ( *Id.*). Hail testified that the partial DNA profile obtained from the two baggies was consistent with Hall and *not* consistent with either Burge or Thompson ( *Id.* at 104). Hail testified that the probability associated with the DNA on the baggies being Hall's was 1 in 26,120,000; meaning that "if [she] were to test twenty-six million one hundred and twenty thousand people's DNA [she] would only expect to find one person that would match up with this partial profile that [she] found on [the] baggie" ( *Id.* at 105). Hail also testified she determined that the DNA found on the baggie was from one source and was not a mixture of several persons' DNA ( *Id.* at 106). Hail identified state's exhibit 11 as the report wherein she summarized her findings ( *Id.*). Hail further testified that her report indicated that the remaining portions of each item tested would be retained at BCI & I and were available upon request for independent analysis ( *Id.* at 107). To Hail's knowledge, no independent analysis had ever been requested ( *Id.*).

On cross-examination, Hail testified that, in addition to being commonly referred to as a forensic biologist, some have referred to forensic biologists as serologists ( *Id.* at 109). Hail testified that no serology test was done on the samples, though one could have possibly been done since two swab samples were taken from the baggies ( *Id.* at 110). Hail testified that no serology was likely done since there was no indication that bodily fluids were found on the baggies ( *Id.*). Hail further testified that DNA can be transferred by sweat, blood, and even dead skin cells from dust, and that

4

she could not say exactly how the DNA was left on the baggies only that it was found on the baggies ( *Id.* at 111-12).  Hail testified that the amount of DNA obtained for testing from baggie number one was "much less than we target" and that the amount of DNA obtained for testing from baggie number two was "just under what we target" ( *Id.* at 113).  Hail explained that the targeted amount of DNA is 1.5 nanograms, and the tested amount was 1.49 nanograms for baggie two ( *Id.* at 114). Hail further explained that the targeted amount is not the minimum amount required for the DNA testing machine to operate correctly but the amount typically needed to get a full DNA profile ( *Id.*).  Hail testified that this lower-than-targeted amount collected may be the reason only a partial DNA profile was obtained ( *Id.*).

Hail also testified regarding the testing procedures, including that sometimes when the DNA is processed in a thermocycler a phenomenon called "stutter" can occur ( *Id.* at 115).  "Stutter" occurs when multiple copies of a sample are created and some of the samples have one less unit than their copies, and stutter can be significant enough to show up as alleles, according to Hail ( *Id.* at 115-16). Hail also explained the phenomenon of "allelic drop-out," which can occur when insufficient amounts of DNA are collected ( *Id.* at 116-17).  Hail testified that "background DNA," identified by defense counsel as "DNA all around everything that exists in life," may exist but is not identified as such in her profession ( *Id.* at 118-19). Hail agreed that possible contamination could occur from so-called "background DNA" and that it might be amplified in testing; however, she also testified that BCI & I has procedures in place to avoid unnecessary contamination ( *Id.* at 119-20).

With respect to the tested samples, Hail testified that at locus D21S11, which she explained as location "S11" on chromosome 21, she identified an allele as "28" ( *Id.* at 122).  Hall's DNA had alleles "28" and "31," one of which came from Hall's father and one of which came from Hall's mother ( *Id.* at 122).  Hail testified that she located "28" but that "31" was not detected either because it was not present or because it was below the standard reporting threshold ( *Id.*).  Hail explained that "31" may have also not appeared due to allelic drop-out, but admitted that the sample might well have had two "28"s as opposed to one "28" and one "31" ( *Id.* at 123).  Hail denied that she was ever instructed to not provide this information to the defendant ( *Id.* at 124).  Hail testified that at D3S1358 a "15" was observed, but no DNA was detected at CSF1PO ( *Id.*).  Hail further testified that of the sixteen locations tested, seven did not provide DNA, which might have been caused by allelic drop-out ( *Id.* at 125).  Hail further testified that even if no "31" was detected, that the DNA sample could be consistent with Hall's profile because of allelic drop-out ( *Id.* at 126).  Hail explained that, in order to account for the locations for which no DNA appeared, those locations were excluded from her statistical calculation regarding the likelihood that the sample was Hall's ( *Id.*).  To Hail's knowledge, the DNA data generated from the testing was not provided to the defense nor had she been contacted by the defense about this information ( *Id.* at 138).  Hail testified that BCI & I has a standard "stutter" correction of 10% used at each tested location. ( *Id.* at 140).  Hail also testified that she did not examine DNA from Helton, Lille or Paquina Burge, or Hall's brother's DNA ( *Id.* at 156).  Hail admitted that the statistical information only accounts for unrelated individuals ( *Id.* at 157).

Sergeant Glenn Crawford, a retired Lima police office with 23 years of service, testified that he was employed with the Lima PD during the summers of 2006 and 2007 ( *Id.* at 161-62).  During

those final years of his career, Crawford was in charge of the police property room, which included responsibility for entering evidence and transporting evidence to BCI & I for testing ( *Id.* at 162). Crawford identified state's exhibit 7 as what appeared to be crack cocaine, state's exhibit 4 as a buccal swab or DNA standard taken from Earl Hall, state's exhibits 2 and 3 as buccal swabs taken from Burge and Thompson, respectively ( *Id.* at 163-64). Crawford testified that each of these items of evidence were in his possession and placed into the property room ( *Id.* at 164-65). Crawford further testified that he took the evidence to BCI & I for testing, and that no evidence left his possession until he dropped it off at BCI & I ( *Id.* at 166).

Gabriel Feltner, a forensic scientist in the biology DNA section at BCI & I, testified that the package (state's Ex. 7) containing the baggies of what appeared to be crack cocaine, was originally opened by Rhonda Boston for purposes of latent fingerprint testing ( *Id.* at 167, 169). After Boston performed testing, he obtained the evidence and tested it, then passed it to Scott Dombransky for further testing ( *Id.* at 169-70). Feltner testified that he thoroughly swabbed the baggies for DNA with two sterile moistened swabs and placed the swabs in the freezer ( *Id.* at 170). Feltner testified that he marked the envelopes containing the swabs with the case number, item number, his initials, and separate code for later testing ( *Id.*).

On cross-examination, Feltner testified that the baggies appeared to be darkened with powder because Boston first tested the baggies for latent fingerprints ( *Id.* at 171). Feltner admitted that he did not see the baggies prior to Boston, but that Vicki Lilly entered the evidence into BCI & I's records ( *Id.* at 172). Feltner admitted that the two baggies could touch each other inside the K-pack when they were brought to him from Boston ( *Id.* at 173). Feltner testified that typically they prefer to have items separately packaged, but if the items are collected as one item, then that is how they arrive at BCI & I ( *Id.* at 174). Feltner admitted that it could be possible for DNA to transfer from one baggie to the next, and that he was unaware of how the evidence was stored prior to it arriving at BCI & I ( *Id.* at 174-75). Feltner further testified that he swabbed the entirety of the two baggies, and that he would generally do this after Boston tested for fingerprints ( *Id.* at 176). Feltner explained that if fingerprints were to be preserved he would not swab an area or the prints would be lifted and preserved ( *Id.* at 177). Feltner denied having any knowledge of the existence of fingerprint ridge detail on the baggies ( *Id.* at 178). Feltner advised that he was aware of a defense motion for public records relating to this case, and that he was instructed that all communication regarding the case should proceed through BCI & I's legal counsel ( *Id.* at 179-80).

Investigator Timothy Goedde, a Lima police officer since 1992, testified that he was a member of the S.W.A.T. team that executed the warrant at 260 S. Pine St. on July 25, 2006 (Sept. 16-18, 2008 Tr. Vol. II at 201). Goedde testified that the executed warrant was a knock and announce warrant, and that the team waited twenty seconds, during which no one answered, before they entered the house ( *Id.* at 205-06). Goedde testified that he was the second team member who entered the residence following Sergeant Chivalia ( *Id.* at 204, 208). Goedde testified that he observed a hallway which led to two bedrooms, but that he did not see anybody in the hallway or anyone go from bedroom to bedroom. ( *Id.* at 207). Goedde also testified that, from his vantage point, he would have

6

seen persons in the hallway or persons leaving one bedroom to go to another ( *Id.*). Goedde testified that persons moving in the residence would be an immediate threat he would have identified ( *Id.* at 208). On cross-examination, Goedde testified that he entered the home at a "controlled" pace equivalent to a "fast walk" ( *Id.* at 209). Goedde admitted that any number of things could have occurred in the home prior to their entry during the twenty second waiting period ( *Id.* at 210). Goedde further testified that he did not end up in the bedrooms where either Hall or Burge were found ( *Id.* at 210-11).

Lieutenant Christopher Protsman, a Lima police officer for thirteen years, testified that he was a sergeant on the S.W.A.T. team that executed the warrant at 260 S. Pine St. on July 25, 2006 ( *Id.* at 213-14). Protsman testified that the warrant was executed at approximately 1:30 p.m.; it was a twenty-count warrant; and he was the fourth person to go inside the residence that day ( *Id.* at 214). Protsman testified that it took him approximately a second to enter the residence and get to the middle of the living room where he could see down the hallway to the bedrooms ( *Id.* at 216); (See state's Ex. 12). Protsman testified that he did not see anyone in the hallway, and that he thought the back bedroom door was closed at that time ( *Id.* at 217). Protsman also testified that he was the first team member to enter the back bedroom, and he observed two people lying underneath a cover on a bed that was in the center of the room ( *Id.*). Protsman pulled the cover off them and ordered them to show him their hands and to roll over on their stomachs, at which time they were placed into handcuffs
( *Id.* at 219-20). In reference to the diagram, Protsman testified that Hall was lying on the left side of the bed and the female was lying on the right side of the bed ( *Id.* at 218). Both individuals were wearing clothing suitable for outdoors and both were awake when he entered the room ( *Id.* at 219). Protsman estimated that it took him about six seconds to reach the back bedroom after entering the residence ( *Id.* at 220). On cross-examination, Protsman confirmed that it took him about six seconds to reach the back bedroom ( *Id.* at 221). Protsman testified that he left the scene once the P.A.C.E. unit arrived ( *Id.*). He further testified that the individuals in the bedroom cooperated and did not struggle ( *Id.* at 221-22). Protsman could not recall who cleared the kitchen, the other bedroom, or the garage but testified that those areas would have been cleared by different team members ( *Id.* at 223). Protsman testified that he left the individuals in the custody of the P.A.C.E. unit ( *Id.* at 224).

Scott Dobransky, a forensic scientist in the chemistry section at BCI & I for the past twenty six years, testified that he had been qualified as an expert in Allen County previously ( *Id.* at 224-26). Dobransky identified state's exhibit 7 as the plastic baggies containing white substance material, which he analyzed ( *Id.* at 226). Dobransky testified that, wearing gloves, he separated the contents from the baggies, keeping the contents of each baggie separate for testing ( *Id.* at 227). The first baggie contained 13.57 grams of white material; the second baggie contained five separate baggies collectively weighing 6.77 grams  ( *Id.* at 228). Dobransky determined the substances in all the baggies was crack cocaine, and issued a report to that end, which he identified as state's exhibit 10 ( *Id.* at 229-31).

On cross-examination, Dobransky testified that, of the total eighteen rocks of crack cocaine in the first baggie, he tested eleven that he randomly selected ( *Id.* at 232). Dobransky admitted that

he did not test the remaining seven rocks from baggie one ( *Id.* at 233). From the second baggie, Dobransky tested seven randomly selected rocks from a total of nine; two were not tested ( *Id.*). Dobransky testified that the weight calculations included both the tested and untested portions ( *Id.*). Dobransky further testified that he performed a cobalt (bluing) test on one of the eighteen rocks ( *Id.* at 234). With regard to hexane testing, Dobransky testified that he tested all seven of nine and eleven of eighteen rocks ( *Id.* at 237). Dobransky testified that crack cocaine is made from powder cocaine, but denied that the crack cocaine could contain powder cocaine residue ( *Id.* at 239-41). Dobransky further testified that, prior to him receiving the baggies, Rhonda Boston tested them for fingerprints, and that Boston handed the baggies directly to him following her testing ( *Id.* at 241-42). Dobransky also testified that the baggies were in one submitted evidence bag so they were likely touching each other ( *Id.* at 242). He further testified that he handled the evidence with gloves but did not change gloves between testing each baggie ( *Id.* at 243).

Investigator Kevin Delong, a Lima police officer with over ten years of service, testified that he was a narcotics investigator with P.A.C.E. and participated in the July 2006 search of 260 S. Pine. St ( *Id.* at 244-45). Delong testified that he was assigned to watch the southwest perimeter of the residence to make sure no individuals attempted to escape ( *Id.* at 246). Delong testified that as he heard the S.W.A.T. team enter the residence, he heard a sliding noise behind him coming from a window-unit air conditioner ( *Id.* at 247-49). Delong testified that "[he] saw this accordion thing was open and a hand came out and put two bags of what looked to [him] like crack cocaine on the window ledge out here" ( *Id.* at 249). Delong explained that the photographs of the house do not show the air conditioning unit since the photo was taken subsequent to the search when the air conditioner was no longer present ( *Id.* at 449-50). Delong testified that the window was just a little above his head, and that the hand he saw was the hand of a black male ( *Id.* at 250). Prior to the S.W.A.T. team entering the residence, there was nothing on the window ledge, according to Delong ( *Id.* at 251). Delong testified that the S.W.A.T. team's presence had caused several people from the neighborhood to gather around the area to see what was happening; so, as soon as he heard the "all clear" from the S.W.A.T. team, he jogged into the back bedroom of the house, pushed open the accordion on the air conditioning unit, and collected the bags of crack ( *Id.* at 252). Delong explained that he did not take photographs of the crack where he located it because he wanted to take control of the evidence quickly so that people gathering in the neighborhood would not see it ( *Id.*). Delong testified that he gave the two baggies of crack to Sergeant Garlock, who was responsible for inventorying the evidence ( *Id.* at 254-55).

Delong identified state's exhibit 5 as the digital scale found on the end table in the bedroom; state's exhibit 6 as five cell phones that were found in the bedroom; state's exhibit 7 as the crack cocaine found on the windowsill; state's exhibit 8 as the bag of crack cocaine found in the shoe. Delong further identified several photographs: state's exhibit 15 as the southwest bedroom with the air conditioner with the accordion style slide open from when he collected the crack cocaine; state's exhibit 16 as the digital scale located on a night table in the bedroom; state's exhibit 17 as the air conditioner in the window where he located the crack cocaine; state's exhibit 18 as the crack cocaine he found on the windowsill; state's exhibit 19 as one of the black tennis shoes with a baggie of crack

inside found on the floor in the bedroom between the bed and the air conditioner; and state's exhibit 21 as the money found on Hall's person ( *Id.* at 253, 255-58).

Delong identified the defendant as the person he found in the back bedroom where he located the crack cocaine ( *Id.* at 257).  Delong further testified that when he moved Hall from the bedroom, Hall stated to Burge "You put that stuff out there; didn't you?" and "That stuff is yours." ( *Id.*). Delong testified that he thought Hall was trying to get Burge to take the blame for the crack that was found on the windowsill ( *Id.*).  Hall waived his right to cross-examine Delong ( *Id.* at 286-88).

Sergeant Charles Godfrey, a Lima police officer for the past twelve years and a P.A.C.E. unit member for the past six years, testified that he participated in the July 25, 2006,  search of 260 S. Pine St ( *Id.* at 311-12).  Godfrey testified that he was stationed on the northeast perimeter of the house, close to the front porch entrance ( *Id.* at 312).  Godfrey testified that he escorted Thompson and Hall out of the bedroom and onto a living room couch ( *Id.* at 313).  Godfrey searched the four to five vehicles that were parked outside of the house, including a full-sized GMC Yukon with twenty-inch rims, a late seventies Bonneville with twenty-inch rims, a mid-nineties black Cadillac, a mid-to-late-seventies Cutlass, and an older white Cadillac ( *Id.* at 314).  Godfrey testified that, after searching the vehicles, he transported Hall to the police station, where he went through booking and inventory ( *Id.* at 315-16).  Godfrey identified state's exhibit 9 as a baggie that he removed from Hall at the house and state's exhibit 21 as $1,885.00 that he removed from Hall at the house  ( *Id.* at 316.).  Godfrey testified that he interviewed Thompson, Burge, and Hall at the detective bureau of the Lima PD ( *Id.* at 317). Godfrey testified that around 6 p.m. on the same day, Sergeant Garlock and he interviewed Hall ( *Id.* at 317, 326).  During that interview Hall informed law enforcement that he had lived at 260 S. Pine St. for a couple months; he was currently unemployed and his last temporary job was about six months ago; he did brakes and mechanical work for about $35-$40 a job; and that these mechanical jobs were his only current source of income ( *Id.* at 326-27).

Hall also told Godfrey and Garlock his version of what happened when the S.W.A.T. team entered his residence ( *Id.* at 327).  Godfrey testified that Hall stated:
* * * he was laying in bed, being the back southwest bedroom, with his girlfriend, Adrienne Thomas (sic).  He said he was laying on his side, facing his girlfriend.  The window in which the crack cocaine was found was behind him. * * * He said he was laying there when he said that William Burge came in the door and yelled that the police were going to come in this mother f*ck*r.  Originally he said he ran out.  Then we asked him more details. What he said was that he was laying on his side. * * * He said that as he was laying there that William Burge * * * came in and yelled something about police were coming and that William Burge ran over to the window behind him and that he heard a commotion and that he then ran out. We asked if he had made any movements or if he had just laid there. He said, "I just laid there. I lifted my head." He said about two minutes later the S.W.A.T. team then came into the room. ( *Id.*).  Godfrey further testified that Hall stated that all of the vehicles were owned by either his cousin or brother but that everyone drives them ( *Id.* at 328).  Godfrey testified that Hall indicated that the money found on his person was given to him by a cousin, and then subsequently stated that the money was from several cousins ( *Id.* at 329).  The street value of the crack cocaine found at the residence was approximately $4,000  according to Godfrey  ( *Id.* at 331-

32).  Godfrey described Thompson as " * * * a very small, very petite, very maintained-you know, hair done, make-up done, nails done.  Everything about her was very neat, so to speak, or very pristine" ( *Id.* at 332).  Godfrey testified that he specifically remembered her nails being done ( *Id.* at 333).

On cross-examination, Godfrey testified that law enforcement entered 260 S. Pine St. because Burge, who lived at that residence, was involved in a drug transaction ( *Id.*).  Godfrey also admitted that none of the money given to the C.I. to purchase drugs matched money possessed by Hall or Burge ( *Id.* at 334-35).  Godfrey testified that he was not aware whether or not Hall had a bank account or whether any of the money Hall possessed was drug money ( *Id.* at 335, 337).  Godfrey also admitted that he was unaware of how much Hall paid in rent, utilities, or other bills at the residence, or whether Hall possessed this cash to pay those bills, but he thought this was a large amount of money to be carrying ( *Id.* at 337-39).  Godfrey also testified that Burge was found with a crack pipe and that Burge was the individual involved in a drug sale the day prior to the search  ( *Id.* at 339).  Godfrey testified Hall never stated that Burge put the crack on the windowsill, but that Burge "must have" put the crack there ( *Id.* at 340-41).  Godfrey testified that Willie Helton admitted to putting the crack on the windowsill the night before the search, and that Helton was indicted for putting crack on the windowsill ( *Id.* at 342).  Godfrey further testified that they found no crack belonging to Burge, and that he did not think it was likely that Burge was putting his crack in the back bedroom ( *Id.* at 342).  Godfrey also testified that he did not check to see if Hall had any tickets associated with any of the vehicles at the residence ( *Id.* at 343).

On re-direct, Godfrey testified that no money was found on Burge ( *Id.*).  Godfrey explained that it would be very time consuming to cross-reference Hall's money to all of the money used by C.I.s ( *Id.* at 344).  All the paperwork for 260 S. Pine St. was in Hall's name ( *Id.* at 345).  On re-cross, Godfrey testified that law enforcement entered the home because Burge sold drugs next door, but that they found no buy money on Hall ( *Id.* at 345-46).  Godfrey also testified that Helton admitted to placing the drugs on the windowsill the night before ( *Id.* at 346).  Godfrey testified that Helton was indicted "for * * * admitting that he placed these drugs on the windowsill the night before" ( *Id.* at 347).  Godfrey testified that Helton was not found during the search ( *Id.*).

Godfrey was the state's final witness.  Thereafter, the trial court admitted state's exhibits one to twenty-two ( *Id.* at 349-53).  Hall made a CRIM.R. 29 motion, which was denied, and then rested his defense. ( *Id.* at 353-56).  The jury then found Hall guilty of possession of crack cocaine  (Sept. 16-18, 2008 Tr. Vol. III at 420-21).  A pre-sentence investigation was requested and the matter set for sentencing on October 27, 2008 ( *Id.* at 424).

*State v. Hall*, 2009 WL 2370913 *13-23 (2009).

## II. PROCEDURAL BACKGROUND.

On September 13, 2007, Petitioner was indicted on one count of possessing crack cocaine, a

violation of OHIO REV. CODE § 2925.11(A) & (C)(4)(d) (Docket No. 10, Exhibit 1, p. 2 of 217).  Trial

commenced on September 16, 2008, and on September 18, 2008, Petitioner was found guilty of possession of crack cocaine as charged in the indictment (Docket No. 10, Exhibit 1, p. 85 of 217). A sentencing hearing was held on October 27, 2008, during which Judge Jeffrey L. Reed sentenced Petitioner to a mandatory term of six years in prison  (Docket No. 10, Exhibit 1, p. 87 of 217).

Petitioner perfected a notice of appeal on October 30, 2008 (Docket No. 10, Exhibit 1, p. 89 of 217).  Five assignments of error were presented for review on direct appeal:

(1)     Petitioner was denied due process of law in various discovery violations that deprived him of the ability to prepare a defense.
(2)     The trial court should have dismissed the charges against Petitioner for constitutional speedy trial violations.
(3)     The trial court erred by not enforcing the clear directives of OHIO CRIM. R. 16, a rule which is designed to provide all parties to a criminal case with the information necessary for a full and fair adjudication of the facts.
(4)     The trial court erred and abused its discretion in sentencing Petitioner to a period of six years of incarceration.
(5)     The verdict was against the manifest weight of the evidence.

(Docket No. 10, Exhibit 1, p. 97 of 217).  On August 3, 2009, the Third District Court of Appeals for Allen County, Ohio, affirmed the conviction.  The court also found:

(1)     Petitioner failed to demonstrate bad faith and the evidence presented at the motion hearing negates any procedural indicia of bad faith.
(2)     The total speedy trial time was tolled from five continuances, a total of 253 days. Subtracting the tolled time from the time which Petitioner was tried, equaled 88 days of speedy trial time attributable to the state, well under the 270 days limitation.
(3)     The trial court applied the correct standard of materiality under OHIO CRIM. R. 16(B)(1).
(4)     Upon review of the entire transcript, the trial court did not err in sentencing Petitioner to six years of imprisonment.
(5)     The court of appeals was not convinced that the jury lost its way or created a manifest injustice that required a new trial.

(Docket No. 10, Exhibit 2, pp. 52-108 of 197).

Petitioner filed a notice of appeal on September 14, 2008,  in the Ohio Supreme Court (Docket No. 10, Exhibit 2, pp. 109-110 of 197).  In the memorandum in support, Petitioner asserted three

11

propositions of law:

    (1)    The constitutional right to a speedy trial is not automatically met simply because the statutory calculation was satisfied through tolling the statutory right to a speedy trial.

    (2)    OHIO CRIM. R. 16(B)(1)(d) and the Due Process Clause each require the prosecution to provide to the defense, both the report and results of DNA testing.

    (3)    A co-defendant includes any person who is criminally charged by the state with an offense out of the same incident or transaction when the co-defendant is related to the offense charged against the accused.

(Docket No. 10, Exhibit 2, p. 112 of 197).  Upon consideration of the memoranda, Chief

Justice Thomas J. Moyer declined jurisdiction to hear the case and dismissed the appeal as not

involving any substantial constitutional question on December 16, 2009 (Docket No. 10, Exhibit 2,

p. 185 of 197).

    Petitioner filed a Petition for Writ of Habeas Corpus on April 16, 2010 (Docket No. 1).  In the

Petition and Traverse, Petitioner asserts:

    (1)    The trial court should have dismissed the charges against Petitioner for constitutional speedy trial violations.

    (2)    Petitioner was denied due process of law in various discovery violations that deprived him of the ability to adequately prepare a defense.

    (3)    The trial court violated Petitioner's right by not enforcing the clear directives of OHIO CRIM. R. 16.

    Subsequently, on September 16,  2010, Petitioner's sentence was declared void as  the court

failed to provide proper notice of post release control. Petitioner  was remanded for resentencing

(Docket No. 13).  Judge Reed scheduled the resentencing hearing for  October 18, 2010 (Docket No.

13, p. 4 of 5).

### III. JURISDICTION.

    A federal court has jurisdiction to consider a petition for a writ of habeas corpus on behalf of

a person in custody pursuant to the judgment of a state court only on the grounds that he or she is

in custody in violation of the constitution or laws or treaties of the United States. *Leslie v. Randle*,

12

296 F.3d 518, 521 (6th Cir. 2002) (*citing* 28 U.S.C. § 2254 (Thomson/West 2002)).

In the instant case, Petitioner is in custody of the Allen County Correctional Institute in Lima, Ohio. The restraint on his liberty is a collateral consequence of his conviction sufficient to satisfy the "in custody" prerequisite to habeas corpus review. Petitioner is seeking relief from his conviction under the Sixth and Fourteenth Amendments to the United States Constitution. The Magistrate finds Petitioner has met the prerequisites and that this Court has jurisdiction to address the merits of Petitioner's Writ of Habeas Corpus.

## IV. HABEAS CORPUS STANDARD OF REVIEW.

Under the ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), a federal court may not grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits unless (1) the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," *Thompson v. Bell,* 580 F.3d 423, 433(6th Cir. 2009) (*citing* 28 U.S.C. § 2254(d)(1), or (2) the state court's decision "was based on an unreasonable application of the facts in light of the evidence presented in the State court proceedings." *Id.* at 433-434 (*citing* 28 U. S. C. § 2254(d)(2)). A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* (*citing Williams v. Taylor,* 120 S. Ct. 1495, 1523 (2000)). An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state court decision unreasonable "simply because that court concludes in its independent judgment that the relevant state-

court decision applied clearly established federal law erroneously or incorrectly." *Id.* (*citing Williams*, 120 S. Ct. at 1522). Rather, the state court decision must be an "objectively unreasonable" application of federal law to be reversed. *Id.* (*citing Williams*, 120 S. Ct. at 1521).

## V. PETITIONER'S MOTION TO STAY

Petitioner requests that this Court stay the instant proceedings until such time as he has exhausted his state court remedies with respect to his resentencing.

Under the stay and abeyance procedure, district courts retain jurisdiction over mixed petitions and the stay of further proceedings pending the complete exhaustion of state remedies. *In re Bowen*, 436 F. 3d 699, 704 fn. 2 (6th Cir. 2006) (*citing Duncan v. Walker,* 121 S. Ct. 2120, 2129 (2001) (Stevens, J., concurring)). The procedure serves as an alternative to simply denying a petition containing unexhausted claims when the failure to retain jurisdiction would foreclose federal review of a meritorious claim because of the lapse of the AEDPA's one year limitations period. *Id.* In order to stay a federal proceeding and hold a habeas case in abeyance pending resolution of state court proceedings, the claim must be based on exceptional or unusual circumstances. *Sitto v. Bock*, 207 F. Supp. 2d 668, 676 (E. D. Mich. 2002).

Assuming that any claim arising from the resentencing has not been exhausted, granting a motion to stay proceedings until the appellate court has ruled is futile. The underlying case is being remanded to state court pursuant to *State v. Singleton*, 124 Ohio St. 3d 173, 920 N. E. 2d 958 (2009). In *Singleton*, the Supreme Court determined that for sentences imposed on or after July 11, 2006, in which the trial court failed to properly impose post-release control, the trial court was required to advise the offender of such supervision following the procedures in OHIO REV. CODE § 2929.191. At Petitioner's resentencing hearing, neither the terms nor conditions of confinement are subject to change. An appeal of this order will not enhance the possibility that Petitioner will be successful on

14

the merits of his Petition or affect the conclusions reached on the merits of his pending claims that are not subject to procedural default.  Even if the stay were granted pending disposition of this claim on appeal, the Court is foreclosed from considering the issue on habeas review.  Requiring  notice of post-release control is a clear application of state law.  There is no issue of constitutional dimension.  Thus, the issues would not be subject to habeas review.  The Magistrate recommends that the Court deny the Motion for Stay.

## VI. DISCUSSION.

The Magistrate has the responsibility of making a determination of whether Petitioner has complied with the procedural steps established to challenge illegal confinement.  Initially, the Magistrate will examine whether Petitioner's claims are barred from review for failure to exhaust his state remedies or procedural default.  Those claims that are not subject to procedural default are reviewed on the merits.

## A.    Procedural Review

### 1.    Exhaustion Standards.

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  *Drummond v. Houk,* 2010 WL 5464172, *13 (N. D. Ohio 2010) (*citing* 28 U.S.C. § 2254(b), (c); *see Rose v. Lundy*, 102 S. Ct. 1198, 1205 (1982))  Exhaustion is fulfilled once a convicted defendant seeks review of his or her claims on the merits from a state supreme court.  *Id.* (*citing O'Sullivan v. Boerckel*, 119 S. Ct. 1728, 1732 (1999)).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Id.* (*citing Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *citing Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990)).  If, under state law, there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred, and the federal

15

habeas court cannot entertain the merits of the claim. *Id.*

A petitioner " 'cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.' " *Id.* at *14 (*citing Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (*quoting Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)). Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Id.* (*see Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Id.* (*see Buell*, 274 F.3d at 34). To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Id.* (*citing Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (*citing Wainwright v. Sykes,* 97 S. Ct. 2497, 2506 (1977)).

## 2.      Procedural Default Standards.

In general, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Id.* (*citing Syke*s, 97 S. Ct. at 2506). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* (*citing Coleman v. Thompson*, 111 S. Ct. 2546, 2564-2565 (1991)).

To be independent, a state procedural rule and the state courts' application of it "must rely in

16

no part on federal law." *Id.* (*citing Fautenberry v. Mitchell*, 2001 WL 1763438, at * 24 (S. D. Ohio 2001) (unreported) (*citing Coleman,* 111 S. Ct. at 2555-2556). A state procedural rule is "adequate" when it is firmly established and regularly followed by the state courts at the time it was applied. *Id.* (*citing Beard v. Kindler,* 130 S. Ct. 612, 618 (2009) (*quoting Lee v. Kemna,* 122 S. Ct. 877, 885 (2002)). If a petitioner failed to timely present any federal habeas claims to the state courts but has no remaining state remedy, then the petitioner has procedurally defaulted those claims. *Id.* (*see Boerckel*, 119 S. Ct. at 1734; *Rust*, 17 F.3d at 160).

The now familiar test followed when the state argues that a habeas claim is defaulted is found in *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986). The four-part test is as follows:

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. *Id.*

Second, the federal court must determine whether the state courts actually enforced the state procedural sanction-that is, whether the state courts actually based their decisions on the procedural rule. *Id.*

Third, the federal court must consider whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. *Id*.

Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice. *Id.* (*citing Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (*citing Maupin, supra*, 785 F.2d at 138) (further citations omitted)).

In determining whether the *Maupin* factors are met, the federal court looks to the "last

17

explained state court judgment." *Id.* (*citing Ylst v. Nunnemaker*, 111 S. Ct. 2590, 2595 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000)). " '[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.' " *Id.* (*citing Morales*, 507 F.3d at 937) (*quoting Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir. 2003)). Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review. *Id.* (see Ylst, 111 S. Ct. at 2593).

If the first three *Maupin* factors are met, the claim is procedurally defaulted. *Id.* However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review. *Id.* (*see Maupin*, 785 F.2d at 138; *Hutchison v. Bell,* 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-275; *Coleman,* 111 S. Ct. at 2564-2565).

3.      **Procedural Analysis of Petitioner's First Ground for Relief -**

        **Speedy Trial Violations.**

Petitioner presented this claim to the court of appeals and the Ohio Supreme Court. The Magistrate finds that ground one is not procedurally defaulted and therefore subject to review on the merits.

4.      **Procedural Analysis of Petitioner's Second Ground for Relief -**

        **Due Process Violations**

The undersigned recommends that the Court find that Petitioner failed to fulfill the exhaustion

18

requirement when the Ohio Supreme Court was not presented with a full and fair opportunity to rule on the claims or enforce its procedural rule.  Because of the nature of Petitioner's default, he may no longer present his claim to the Ohio Supreme Court under Ohio's doctrine of *res judicata.*  The Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata* is an adequate ground upon which the state court can foreclose habeas relief.  *Lundgren v. Mitchell*, 440 F. 3d 754, 765 (6th Cir. 2005).  *Res judicata* does not implicate federal law.  *Id.*  Petitioner has failed to argue the presence of some objective factor which impeded compliance with the procedural rule.  Neither has Petitioner presented new evidence to support an assertion of innocence that would allow the Court to consider his claims despite his procedural default.  The bar to federal habeas review has not been removed from Petitioner's second claim for relief so that the Court can reach its merits.

  *5.*  **Procedural Analysis of Petitioner's Third Ground for Relief -**

    **Violation of Ohio Crim.R.16**

  Petitioner presented the essence of this claim to the court of appeals and the Ohio Supreme Court.  In the court of appeals, Petitioner argued that the trial court erred by enforcing the clear directives of OHIO CRIM. R. 16.  In the memorandum filed with the Supreme Court, Petitioner expounded on this allegation by examining the failure of the trial court to require the prosecution to provide DNA evidence.  The Magistrate will address the merits of whether the trial court's decision is an unreasonable application of state law.

**B.**  **Substantive Review of Petitioner's First and Third Claims.**

  Here the Magistrate examines the essential legal principles and their application to Petitioner's first and third claims under the Speedy Trial Act, Sixth Amendment and OHIO CRIM. R. 16.

  **1.**  **Substantive Analysis of Petitioner's First Claim.**

19

Petitioner alleges a violation of OHIO'S SPEEDY TRIAL ACT and the Sixth Amendment of the United States Constitution.  Petitioner contends that the statutory limitations within which to conduct his trial were not enforced by the trial court.

### A.    Ohio's Speedy Trial Act.

OHIO REV. CODE § 2945.71(C)(2) provides that a person against whom a charge of felony is pending shall be brought to trial within 270 days after the person's arrest.  However, a violation of the state speedy trial statute does not present a constitutional claim.  *Hutchison v. Marshall,* 744 F.2d 44, 45-47 (6th Cir. 1984), *cert. denied,* 105 S. Ct. 1208 (1985).  To the extent that Petitioner alleges a violation of the OHIO SPEEDY TRIAL ACT, his claim raises an issue of state law only that is not cognizable in a federal habeas corpus proceeding.  *Hopkins v. Banks*, 2010 WL 5644827, *4 (N. D. Ohio 2010) (*citing Caddy v. Ohio*, 2010 WL 264007, *3 (S. D. Ohio 2010); *Pulley v. Harris,* 104 S. Ct. 871, 874 (1984)).  This Court does not have the authority in a habeas corpus case even to consider whether the state courts misinterpreted state law.

### B.    The Sixth Amendment Speedy Trial Provision.

The Sixth Amendment guarantees that in all criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial."  U.S. CONST. amend. VI (Thomson Reuters 2011).  A claim that the state has violated this constitutional guarantee is a fact-intensive inquiry requiring the balancing of (1) "whether [the] delay before trial was uncommonly long," (2) "whether the government or the criminal defendant is more to blame for that delay," (3) "whether, in due course, the defendant asserted his right to a speedy trial," and (4) "whether he suffered prejudice as the delay's result." *Wilson v. Mitchell,* 250 F.3d 388, 394 (6th Cir. 2001) (*citing Doggett v. United States*, 112 S. Ct. 2686, 2650 (1992) (*citing Barker v. Wingo*, 92 S. Ct. 2182, 2191-2192 (1972)).

The first step in this balancing test, the length of the delay, is the triggering factor because until there is a delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* (*citing Barker*, 92 S. Ct. at 2191-2192).  In the Sixth Circuit, a delay longer than a year is presumptively prejudicial. *Id.* (*citing United States v. Mundt*, 29 F. 3d 233, 235 (6th Cir. 1994)).

In this case, Petitioner does not dispute that 341 days elapsed from the time Petitioner was arrested until his trial commenced (Docket No. 10, Exhibit 2, p. 60 of 197).  However, the length of days during which the trial was delayed does not reach or exceed the one year parameter.  Thus, the delay of 341 days is not deemed presumptively prejudicial.  Petitioner has failed to demonstrate that the delay of that magnitude was prejudicial.  This finding weighs in favor of the state.

The second step requires that the fact finder identify the reason for the delay. *Id.* (*see Barker*, 92 S. Ct. at 2191).  This analysis is important because it determines the amount of proof that a petitioner must proffer in order to show prejudice. *Id.* (*see United States v. Brown*, 169 F.3d 344, 350-51 (6th Cir. 1999) (holding that the Sixth Amendment was violated because a five-year pretrial delay was primarily attributable to the government's negligence)).

In this case, the government was not primarily responsible for the delay.  The delay was overwhelmingly due to Petitioner's  request for five continuances (Docket No. 10, Exhibit 2, p. 60 of 197).  This factor weighs in favor of the state.

The third step requires the fact finder to assess whether the defendant timely asserted his Sixth Amendment rights. *Id.* (*citing Barker*, 92 S. Ct. at 2192).  In the instant case, Petitioner's trial counsel made a motion to dismiss, in part, for violation of the Petitioner's fundamental right to a speedy trial.  A hearing on this motion was conducted prior to trial (Docket No. 10, Exhibit 1, pp. 74-75 of 217).

This factor weighs in favor of Petitioner.

At the final step, the court must determine whether the defendant suffered prejudice as a result of the delay.  In <u>Doggett</u>, the Supreme Court addressed the amount of prejudice that a defendant must prove when the government is negligent in its pursuit and prosecution of a defendant.  *Id.*  Unlike a bad-faith delay, from which prejudice is presumed, or governmental exercise of reasonable diligence, from which actual prejudice must be proven, "our toleration of . . . negligence varies inversely with its protractedness . . . and its consequent threat to the fairness of the accused's trial."  *Id.* (*citing Doggett, supra*, 112 S. Ct. at 2693).

Under this final prong of the balancing test, the Magistrate finds that the Petitioner has failed to show that he was actually prejudiced by the delay.  He was not subject to pretrial incarceration and during this time, his counsel continued to conduct discovery.  There is no evidence that the government was negligent in its pursuit and prosecution.  This factor, too, favors the state.

**C.     Conclusion**.

After considering the foregoing factors,  the Magistrate recommends that the Court deny the Petitioner's request for relief based on his speedy trial claim.

**2.     Substantive Analysis of Petitioner's Third Claim.**

To the extent Petitioner premises his argument upon OHIO CRIM. RULE 16(B)(1), there is no constitutional violation cognizable on habeas.  *Hicks v. Collins,* 384 F.3d 204, 220 (6th Cir. 2004) (*See Lorraine v. Coyle,* 291 F.3d 416, 441 (6th Cir. 2002); *see* 28 U.S.C. § 2254(a) (habeas corpus proceedings may be entertained only if Hicks "is in custody in violation of the Constitution or laws or treaties of the United States")).  The magistrate finds that there is no constitutional violation

cognizable in this  habeas proceeding .

## VII. CONCLUSION

For the foregoing  reasons, the Magistrate recommends that the Court deny both  the Motion to Stay and the Petition for Writ of Habeas Corpus and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   April 21, 2011


## VIII.  NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in United States v. Walters, 638

23

F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In Thomas v. Arn, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.